UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

POWERHOUSE MARKS LLC,[1]

       Plaintiff,

v.                                 Case No. 04-73923
                                     Honorable Patrick J. Duggan

CHI HSIN IMPEX, INC., COSTCO
WHOLESALE CORP., DICK'S SPORTING
GOODS, INC., DUNHAM'S ATHLEISURE CORP.,
MEIJER, INC., and WAL-MART STORES, INC.,

       Defendants.
_____/

**<u>OPINION</u>**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on January 4, 2006.

PRESENT:   THE HONORABLE PATRICK J. DUGGAN
                 U.S. DISTRICT COURT JUDGE

On October 6, 2004, plaintiff Powerhouse Marks LLC ("Powerhouse") filed this

action against defendant Chi Hsin Impex Inc. ("Impex"), alleging that Impex's sale of

certain fitness equipment infringes Powerhouse's trademarks thereby violating federal

and state law. Specifically, Powerhouse alleges that Impex's use of its marks constitutes

infringement in violation of Michigan common law and the federal Lanham Act (15

_____

[1]Powerhouse Licensing LLC, initially named as a plaintiff in this action, was
dismissed on September 7, 2005.

1

U.S.C. § 1114), unfair competition in violation of the Lanham Act (15 U.S.C. § 1125),

and a violation of the Michigan Consumer Protection Act (MICH. COMP. LAWS ANN. §

445.903).  Plaintiff filed an amended complaint on April 5, 2005, adding as defendants

the following retailers that sell fitness equipment manufactured by Impex: Costco

Wholesale Corporation ("Costco"), Dick's Sporting Goods Inc. ("Dick's"), Dunham's

Athleisure Corporation ("Dunham's"), Meijer Inc. ("Meijer"), and Wal-Mart Stores Inc.

("Wal-Mart").

Presently before the Court are the following motions for summary judgment filed

by the parties:

(1)     Powerhouse's motion for summary judgment of infringement and entry of
        permanent injunction, filed May 13, 2005 (cited as Pl.'s Mot.);

(2)     A motion for summary judgment filed by all defendants, except Wal-Mart,
        with respect to laches and equitable estoppel, filed May 16, 2005 (cited as
        Defs.' Mot. on laches);

(3)     Wal-Mart's motion for summary judgment regarding laches and equitable
        estoppel, filed May 16, 2005;[2]

(4)     Powerhouse's cross-motion for summary judgment with respect to laches
        and equitable estoppel, filed September 2, 2005 (cited as Pl.'s cross-mot.);[3]

(5)     A motion for summary judgment regarding limitation of damages based on

---

[2]The motion for summary judgment filed by Wal-Mart– the only defendant represented by separate counsel from Impex– merely relies on and incorporates by reference the arguments and legal conclusions set forth in the remaining defendants' motion.

[3]Powerhouse's cross-motion for summary judgment is part of its response to defendants' motion for summary judgment.

the applicable statute of limitations, filed by all defendants, except Wal-Mart, on September 29, 2005 (cited as Defs.' Mot. on damages); and

(6)    Wal-Mart's motion for summary judgment that (1) Powerhouse is not entitled to the monetary recovery it seeks and (2) Powerhouse's claims are barred by the applicable statute of limitations, filed October 3, 2005.[4]

The Court held a hearing on these motions on November 10, 2005.

## I.    Factual Background

In 1976, William and Norman Dabish (brothers) opened a gym in Highland Park, Michigan, which they named "Powerhouse Gym."  In 1980, the Dabish brothers incorporated "Powerhouse Bodybuilding Gyms, Inc." in the State of Michigan. Powerhouse Bodybuilding Gyms registered the trademarks "Powerhouse Gym" plus design, "Powerhouse Gym," and "Powerhouse" with the United States Patent and Trademark Office ("PTO") in October 1983, May 1985, and June 1994, respectively.  On January 1, 1999, Powerhouse Bodybuilding Gyms assigned its marks to Powerhouse.  On the same date, Powerhouse entered into a licensing agreement with Powerhouse Licensing LLC to license the marks.

Since 1999, approximately 200 health clubs throughout the United States have been licensed to use the Powerhouse Gym name.  Powerhouse has issued licenses to health clubs outside the United States as well.  In addition to using Powerhouse's marks in the name of the health clubs, Powerhouse and its licensees use the Powerhouse marks

---

[4]Wal-Mart's motion merely relies on and incorporates the other defendants' motion for summary judgment on these issues.

3

for bodybuilding services, on athletic training attire, fitness equipment, publications, multivitamin supplements, and other nutritional products.

Impex is a California corporation that started in 1980 as a manufacturer of fitness products sold by other companies. Beginning in late 1985, Impex developed into a direct distributor of fitness products. In late 1995, Impex decided to expand its product line to include fitness equipment that would be distributed nationwide through retail chain stores. At that time, Impex began investigating the name "Powerhouse" for its equipment, purportedly because Impex wanted a name connoting "strength" to consumers. Annie Chung, Impex's account director, conducted a search of the PTO's records and determined that "Powerhouse" was not registered for fitness equipment. Impex therefore began using the name "Powerhouse" for its fitness equipment beginning in November 1995.

In March 1996, Impex applied to register the mark "Powerhouse Fitness" for various fitness equipment with the PTO. Impex's application was published for opposition on November 12, 1996. The PTO issued a trademark to Impex for "Powerhouse Fitness" on February 4, 1997.

In February 1997, Impex's representatives attended the Sport Goods Manufacturers Association ("SGMA") Super Show. Impex's representatives approached Powerhouse's booth and spoke to an individual named Brian Kukon, who they believed represented Powerhouse. Impex's representatives informed Kukon about Impex's use of "Powerhouse" with its fitness equipment and suggested a joint venture to cross-market

4

the Powerhouse mark.  According to Impex's representatives, Kukon informed them that Powerhouse was not interested in a cross-marketing campaign because its gyms were concentrated in the mid-west and it did not see a benefit in Impex's national program. Impex's representatives claim that during these discussions Kukon made no objection to Impex's use of "Powerhouse" for its fitness equipment.

Thereafter, Impex negotiated agreements with numerous retailers for nationwide distribution of Impex's "Powerhouse" fitness equipment.  As early as February 1997, but no later than early 1999, Impex's customers advertised and promoted Impex's "Powerhouse" fitness equipment through print advertisements in newspapers throughout the country, including the mid-west, and in their retail stores.  *See* Lemere Decl. ¶ 5 Dick's Vice President of Advertising has provided charts reflecting its newspaper advertisements of Impex's "Powerhouse" products in the years 1999, 2000, and 2001. *See* Corbett Decl. Ex. A.

According to Dunham's Director of Advertising, Dunham's ran newspaper advertisements for Impex's "Powerhouse Cage Bench System" more than thirty times between 1999 and 2001, in approximately ninety newspapers throughout the mid-west and around the country, including major newspapers such as the *Detroit News*, the *Milwaukee Journal Sentinal*, and the *Pittsburgh Post-Gazette*.  *See id.* ¶ 3; Stockmeyer Decl. ¶¶ 3-4.  Twenty-eight of the newspapers in which Dunham's advertised Impex's "Powerhouse" products are based in Michigan.  *See* Lemere Decl. ¶ 4 & Ex. A. Dunham's advertised Impex's "Powerhouse" equipment on average at least once a month

5

in the major newspapers in which it advertised. *See id.* ¶ 4. Dunham's also displayed a floor model of Impex's "Powerhouse Cage Bench System" in its stores from October 1999 until July 2001. *See* Stockmeyer Decl. ¶¶ 6-7.

On April 2, 2002, Powerhouse petitioned the PTO to cancel Impex's "Powerhouse Fitness" trademark registration. Impex did not receive notice of the cancellation petition because the PTO sent the notice to an outdated address for Impex. Impex's registration subsequently was cancelled by default. Powerhouse did not directly communicate any objection to Impex regarding the latter's use of the "Powerhouse" mark until it filed this lawsuit on October 6, 2004.

## II.     Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must

6

come forward with specific facts showing that there is a genuine issue for trial.  *See*

*Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348,

1356 (1986). To demonstrate a genuine issue, the non-movant must present sufficient

evidence upon which a jury could reasonably find for the non-movant; a "scintilla of

evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable

inferences" in the non-movant's favor. *See id.* at 255.  The inquiry is whether the evidence

presented is such that a jury applying the relevant evidentiary standard could "reasonably

find for either the plaintiff or the defendant."  *See id.*

## III.   Infringement

To maintain an action for trademark infringement under the Lanham Act, a

plaintiff must prove (1) ownership of the mark; (2) continuous use; (3) secondary

meaning if the mark is descriptive; and (4) a likelihood of confusion among consumers.[5]

*Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1105 (6th Cir.

1991)("*Homeowners*").  As to the third factor, registration on the PTO's principal register

creates a presumption that the mark is not descriptive.  *Champions Golf Club, Inc. v. The*

*Champions Golf Club, Inc.*, 78 F.3d 1111, 1118 (6th Cir. 1996).  As with most

---

[5]Powerhouse's claims based on Michigan common law and the Michigan
Consumer Protection Act are dependent upon the likelihood of confusion standard as
well. *See Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1104-
05 n.1 (6th Cir. 1991)(citing *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d
831, 833 (6th Cir. 1983) and *Schreiber Mfg. Co. v. Saft America, Inc.*, 704 F. Supp. 759,
769 (E.D. Mich. 1989)).

7

infringement actions, the fourth factor is the one in dispute in this case.

The fourth factor focuses on whether consumers could believe that the plaintiff endorses the defendant's use of the former's mark(s).  *See Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997)("*Daddy's*"). In other words, "[t]he touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Id*.  When evaluating the "likelihood of confusion," courts analyze and balance the following factors:

> (1) the strength of the senior mark;
> (2) the similarity of the marks;
> (3) the relatedness of the goods or services;
> (4) evidence of actual confusion;
> (5) marketing channels used;
> (6) likely degree of purchaser care;
> (7) the intent of the junior user in selecting the mark; and
> (8) the likelihood of expansion of the product lines using the mark.

*Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982)("*Frisch's*"); *see also Autozone, Inc. v. Tandy Corp.*, 373 F.3d 786, 792-93 (6th Cir. 2004)(applying *Frisch's* factors).

"These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely." *Homeowners*, 931 F.2d at 1107.  "[A] plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1886 (6th Cir. 1988)("*Wynn I*").  The ultimate question is "whether relevant consumers are likely to believe that the

8

products or services offered by the parties are affiliated in some way." *Id.*   Stated

differently, "[t]he general concept underlying the likelihood of confusion [test] is that the

public believe that the mark's owner sponsored or otherwise approved use of the

trademark." *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 834 (6th Cir.

1983).  With respect to a motion for summary judgment in a trademark infringement

action, "where the likelihood of confusion is the dispositive issue, 'a nonmoving party

must establish . . . that there are genuine factual disputes concerning those of the [eight]

factors which may be material in the context of the specific case.'" *Data Concepts, Inc.*

*v. Digital Consulting, Inc.*, 150 F.3d 620, 624 (6th Cir. 1998)(citing *Homeowners*, 931

F.2d at 1107).

### A.    The Berger Survey

Before addressing *Frisch's* eight factors, the Court first must address the survey on

which Powerhouse heavily relies to argue that many of those factors favor a finding that

there is a likelihood of confusion.  Professor James T. Berger conducted a survey for

Powerhouse "to determine whether [Impex's] use of POWERHOUSE on its exercise

equipment has confused consumers to erroneously think that the exercise equipment is

affiliated, connected, or otherwise associated with the Plaintiffs."  *See* Berger Decl. ¶ 12.

Berger conducted his survey at shopping malls in Troy, Michigan; Hicksville, New York;

and Jacksonville, Florida.  *See id.* ¶ 13.  Berger selected these interview sites because

there were three or more Powerhouse fitness centers within a twelve mile radius.  *See*

Berger Report (att. to decl.) at 4.  Berger's surveyors interviewed one hundred and fifty

9

individuals (fifty at each mall), age eighteen years or older, who had worked out in a fitness center, club, or gym in the preceding five years.  *See id*. at 1 & Decl. ¶ 14.  Those individuals were brought into a room in which five branded pieces of workout equipment were on display.  *See* Berger Report at 4.  After the individuals examined the equipment, they were asked "Which, if any, equipment brand that you see in this room do you believe is sponsored by, licensed by or associated with a particular fitness center, fitness club or fitness center chain?"  *See id*. at 6 & Decl. ¶ 18.  If the participant identified a particular piece of equipment, he or she was then asked: "What is the fitness center, fitness club or fitness chain?"  *See id.*

According to Berger, his survey at the Troy, Michigan mall revealed that sixty percent of those questioned believed that Impex's "Powerhouse" branded exercise equipment was sponsored by, licensed by, or associated with Powerhouse.  *See* Decl. ¶ 20.  At the Hicksville, New York mall, fourteen percent of those questioned thought that Impex's equipment was sponsored by, licensed by, or associated with Powerhouse.  *See id*. ¶ 23.  Fifty-two percent of those questioned at the Jacksonville, Florida mall thought that Impex's equipment was sponsored by, licensed by, or associated with Powerhouse.  *See id*. ¶ 26.  Berger therefore concluded that Impex's use of "Powerhouse" on its exercise equipment has caused a significant number of consumers to erroneously believe that its exercise equipment is sponsored by, licensed by, or associated with Powerhouse.  *See id*. ¶ 30.

Defendants argue that Berger "woefully" failed to conduct his survey in

10

accordance with accepted principles of survey research and that his survey results therefore should be accorded virtually no weight.[6]  "Valid consumer surveys can be significant evidence of actual confusion."  *Sports Auth., Inc. v. Abercrombie & Fitch, Inc.*, 965 F. Supp. 925, 933 (E.D. Mich. 1997)(citing *Anheuser-Busch, Inc. v. Balducci Publ'ns*, 28 F.3d 769, 775 (8th Cir. 1994)).  "Nevertheless, '[t]he proponent of a consumer survey has the burden of establishing that it was conducted in accordance with accepted principles of survey research.'"  *Id.* (quoting *Nat'l Football League Properties v. New Jersey Giants*, 637 F. Supp. 507, 513 (D.N.J. 1986)).  The Federal Judicial Center's *Manual for Complex Litigation* states that in assessing the validity of a survey, courts should take into account such relevant factors as whether:

> •the population was properly chosen and defined;
> •the sample chosen was representative of that population;
> •the data gathered were accurately reported; and
> •the data were analyzed in accordance with accepted statistical principles.

MANUAL FOR COMPLEX LITIGATION (FOURTH), § 11.493 (2004); *see also Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 765 (E.D. Mich. 2003)(utilizing these factors to evaluate reliability of survey); *Sports Auth.*, 965 F. Supp. at 933 (same).  Additionally, the court should take into account the following:

> •whether the questions asked were clear and not leading;
> •whether the survey was conducted by qualified persons following proper interview procedures; and

---

[6]Defendants in fact filed a motion *in limine* to exclude the Berger survey from evidence at trial or at any hearing on October 3, 2005.

•whether the process was conducted so as to ensure
objectivity (e.g., determine if the survey was conducted in
anticipation of litigation and by persons connected with the
parties or counsel or by persons aware of its purpose in the
litigation).

*Id.*

Defendant's expert, Dr. Sandra R. Cogan, declares that Berger failed in numerous

ways to satisfy these fundamental principles of survey. *See* Cogan Decl. The Court does

not find it necessary to address all of Cogan's criticisms, as an analysis of only some of

the above-listed criteria leads this Court to find Berger's survey deficient.

First, "[i]dentification of the proper universe is recognized as a critical element in

the development of a survey." *Wells Fargo*, 293 F. Supp. 2d at 767 (citations omitted).

"Selection of a proper universe is so critical that 'even if the proper questions are asked in

a proper manner, if the wrong persons are asked, the results are likely to be irrelevant.'"

*Id*. (quoting 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, §

32:159 at 32-250.3 (4th Ed. 2003)(hereafter "__ McCarthy")). In a case where the

plaintiff alleges that the defendant's use of the plaintiff's marks causes customers to

mistakenly think that the defendant's goods or services are from the same source as or are

connected with the plaintiff's goods or services (referred to as "forward confusion"), "the

proper universe to survey is the potential buyers of the *junior user's* [i.e. defendant's]

goods or services." 5 McCarthy, § 32:159 (emphasis in original); *see also Hutchinson v.

Essence Commc'ns, Inc.*, 769 F. Supp. 541, 559-60 (S.D.N.Y. 1991)(noting that "[i]t is

well-settled in this circuit that the universe of the survey must include potential

12

purchasers of the junior user's product" and finding a survey of only potential users of the senior user's product improper); *Gen. Motors Corp. v. Cadillac Marine & Boat Co.*, 226 F. Supp. 716, 737 (W.D. Mich. 1964)(finding key problems with survey conducted to establish likelihood of confusion, including the fact that individuals surveyed were not "purchasers" of the defendant's product).

Berger's survey did not focus on buyers of fitness equipment; rather the population he surveyed was limited to individuals who worked out at fitness centers, clubs, or gyms in the preceding five years. These are individuals who are customers or potential customers of Powerhouse's products and/or services. Moreover, because Berger intentionally conducted his survey at malls within a short radius of three or more Powerhouse gyms, it is likely that the individuals surveyed were more familiar with Powerhouse's marks than the general population and thus more likely to associate Impex's fitness equipment with those marks than the general population and/or the average purchaser of home fitness equipment.

Not only was the population improperly chosen and defined, but Berger only surveyed one hundred and fifty respondents. The Sixth Circuit has questioned whether surveys of so few respondents are statistically significant. *See Autozone*, 373 F.3d at 799 n.2 (noting that a survey of only 110 respondents may not be statistically significant). The significance of the answers provided by this small pool of respondents is diminished further by the fact that Berger did not present any screening questions to eliminate individuals with bias– the most notable example being employees of Powerhouse.

13

"A survey also is not reliable if it suggests to the respondents an answer that would not otherwise have occurred to them." *Wells Fargo*, 293 F. Supp. 2d at 768.  "It is improper to suggest a business relationship where the respondent may previously have had no thought of any connection." 5 McCarthy § 32:172.  In this case, Berger asked respondents: "Which, if any, equipment brand that you see in this room do you believe is sponsored by, licensed by or associated with a particular fitness center, fitness club or fitness center chain."  This question clearly led respondents to find, not only a connection or association between the fitness equipment shown and some other product or service, but specifically a fitness center, club, or chain.  *See, e.g., Wuv's Int'l, Inc. v. Love's Entm't, Inc.*, 208 U.S.P.Q. 736, 755-76 (D. Colo 1980)(finding survey question "Do you believe that this restaurant is connected with or related to any other restaurants?" leading and unnecessarily suggestive because it deliberately plants in the respondents' minds that the defendant's restaurant might be connected with or related to another entity, specifically another restaurant).

Finally, Berger was hired by Powerhouse's attorneys to conduct the survey for use in this litigation.  *See* Berger Report at 3.  Berger states that "[his] task was to create and conduct a survey to determine if a typical person who goes to a physical fitness center believes that defendant's branded exercise equipment . . . is sponsored by, licensed by, or associated with the plaintiff[]."  *Id*. at 3-4.  Thus, Berger's survey was not only conducted in anticipation of this litigation (a factor the *Manual for Complex Litigation* advises courts to consider), but it also was conducted by someone associated with Powerhouse

14

and its counsel and was conducted for the specific purpose of demonstrating consumer confusion based on Impex's use of the Powerhouse name.

In light of these deficiencies in Berger's survey, the Court will accord it little weight in evaluating the pending motions. *See Sports Auth.*, 965 F. Supp. at 934 (concluding that deficiencies in a survey do not require total exclusion of the survey in deciding a motion for summary judgment but, instead, are relevant to the weight the court should accord the survey results).

### B.    Strength of the Mark

"The strength of a mark is a factual determination of the mark's distinctiveness. The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection is due." *Daddy's*, 109 F.3d at 280. "A mark is strong and distinctive when 'the public readily accepts it as the hallmark of a particular source;' such acceptance can occur when the mark is unique, when it has received intensive advertisement, or both." *Id.* (quoting *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985)("*Frisch's II*")). The strength of a mark is determined by considering two factors: the mark's distinctiveness (based on the category into which it falls and how long it has been registered) and the degree of recognition of the mark in the marketplace. *Homeowners*, 931 F.2d at 1107 (citation omitted)*; see also Blockbuster Entm't Group v. Laylco, Inc.*, 869 F. Supp. 505, 509 (E.D. Mich. 1994)(quoting *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir. 1993))(providing that "[a] mark's strength is measured by two factors: '(1) the degree to which it is inherently distinctive;

15

and (2) the degree to which it is distinctive in the market place.'")

Courts place trademarks into one of four categories: generic, descriptive, suggestive, and fanciful or arbitrary. *Daddy's*, 109 F.3d at 280 (citing *Champions Golf Club*, 78 F.3d at 1116-1117). "These categories constitute a spectrum of increasing strength" with fanciful and arbitrary marks being the strongest and most distinctive and generic marks being the weakest and least distinctive. *Id*. The parties agree that Powerhouse's marks are suggestive. "A suggestive mark employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use imagination, thought, and perception to reach to reach a conclusion as to the nature of the goods." *Blockbuster Entm't*, 869 F. Supp. at 510 (quoting *W.W.W. Pharm.*, 984 F.2d at 572). Suggestive marks are considered "weaker" than arbitrary and fanciful marks and confusion is said to be less likely. *Autozone,* 373 F.3d at 794 (citing *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987)). Once a mark has been registered for five years, however, a presumption of strength is conferred on the mark. *Wynn Oil Co. v. Am. Way Serv. Corp.* ("*Wynn II")*, 943 F.2d 595, 600 (6th Cir. 1991)(quoting *Wynn I*, 839 F.2d at 1187).

As to the distinctiveness of its marks in the marketplace, Powerhouse argues that Berger's survey results demonstrate that the marks are strong. According to Berger, consumer recognition of the "Powerhouse" marks exceeds Powerhouse's share of the health club market significantly and therefore demonstrates strong consumer recognition of those marks. *See* Berger Decl. ¶¶ 20-28. For example, while Powerhouse has a six

16

and a half percent share of the health club market near the Troy, Michigan mall where
Berger conducted his survey, Berger concludes that Powerhouse "enjoy[s] a 60% share of
consumer's minds."[7] *See id.* ¶ 20-22.  For the reasons set forth previously, however, the
Court finds the accuracy of Berger's survey results and therefore his conclusions
questionable.

Nevertheless, to establish the strength of its marks, Powerhouse also relies on an
Impex document titled "Company Biography and Brand Names" which Impex distributed
to its retail customers.  In this document, Impex states that its success is based, in part, on
"driving brand name recognition."  *See* Pl.'s Mot. Ex. 4.  The document then lists the five
major recognizable brands Impex utilizes, including Powerhouse.  *See id.*  Impex states:
"The Powerhouse brand is used for strength-training equipment, which includes benches,
home gyms, and free weight accessories.  The fact that the 2nd largest health club chain
(Powerhouse Gyms) has almost the identical trademark also helps brand exposure." *See
id*. Powerhouse argues that these statements constitute an admission by Impex that
Powerhouse's marks are strong.  While the Court finds this document persuasive,
defendants present other evidence to raise a genuine issue as to the strength of
Powerhouse's marks in the marketplace.

The strength of a mark may be weakened as a result of third-party use of the mark.

_____

[7]This sixty percent figure is based on the percentage of respondents who associated
Impex's "Powerhouse" equipment with Powerhouse.  Not only does the Court find this
figure questionable, but it also questions Berger's leap from this figure to his conclusion
that it represent's the share of respondents' minds that Powerhouse enjoys.

17

*Data Concepts*, 150 F.3d at 625.  It is not enough, however, for the defendant to simply

show the existence of third-party use of the mark in the records of the PTO.  "In order to

be accorded weight a defendant must show what actually happens in the marketplace."

*Homeowners*, 931 F.2d at 1108.  As the Sixth Circuit subsequently explained, the

defendant must establish that the third-party use of the mark occurs in similar industries.

*Daddy's*, 109 F.3d at 281 (citing *Nat'l Cable Television Ass'n, Inc. v. Am. Cinema

Editors, Inc.*, 937 F.2d 1572, 1579-80 (Fed. Cir. 1991)(explaining that frequent third-

party registrations may not reduce the strength of a mark if the common marks are not

used in closely related activities)).  Additionally, the court must view the trademark as a

whole.  *Autozone*, 373 F.3d at 795 (dismissing pervasive third-party use of "zone" in the

marketplace to demonstrate weakening of the plaintiff's mark "Autozone.")

Defendants present evidence of many third-party uses of the term "Powerhouse" in

similar industries.  According to a search of the PTO's records conducted for defendants

by a trademark search firm, these uses include the following: "Gymnastic Powerhouse"

and "Gymnastic Power House" for gymnastic instruction; "Powerhouse Pilates" for

aerobic and exercise classes; "Pilates Powerhouse" for health club services; "Powerhouse

Fitness & Aerobics" for health club services; "Gym Power House" for physical fitness

facilities; and "House of Power" for athletic club and gymnasiums membership and

gymnasium equipment.  *See* Schwartz Decl. Ex. D.  The search firm further identified

fifty-five internet domain names owned by third parties which include "Powerhouse" and

advertise fitness related products and/or services.  *See id*. Ex. E.  Such widespread use of

18

the name "Powerhouse" in association with the fitness industry suggest that

Powerhouse's marks are not distinct in the marketplace and therefore that consumers are

less likely to be confused by Impex's use of the "Powerhouse" mark.

The Court therefore finds a genuine issue of material fact with respect to the

strength of the "Powerhouse" mark.

### C.    Relatedness of the Goods and/or Services

The Sixth Circuit has identified three categories regarding the relatedness of the

goods and services of parties:

> (1) cases in which the [goods] of the parties are in direct
> competition, "in which case confusion is likely if the marks
> are sufficiently similar"; (2) cases in which the "[g]oods are
> somewhat related but not competitive, so that the likelihood
> of confusion may or may not result depending on other
> factors"; and (3) cases in which the "[goods] are totally
> unrelated, in which case confusion is unlikely."

*Champions Golf Club*, 78 F.3d at 1118 (quoting *Homeowners*, 931 F.2d at 1108).  As the

Sixth Circuit has further elaborated:

> Services and goods "are 'related' not because they coexist in
> the same broad industry, but are 'related' if the services are
> marketed and consumed such that buyers are likely to believe
> that the services, similarly marked, come from the same
> source, or are somehow connected with or sponsored by a
> common company."

*Daddy's*, 109 F.3d at 282-83 (quoting *Homeowners*, 931 F.2d at 1109).  Ultimately, the

relatedness of goods and/or services hinges on whether the goods and/or services are so

related "that they are likely to be connected in the mind of a prospective purchaser?"  *Id*.

19

at 283.  Where the parties' products serve the same function, courts have found the products related.  *See Wynn I*, 839 F.2d at 1187 (finding bulk car wax and complete car washing service of one party and car care products of other party closely related because they offer consumers fundamentally the same thing: a clean car); *but see Sports Auth.*, 965 F. Supp. at 937 (finding products of sporting goods store only somewhat related to products of clothing retailer because the parties do not compete directly and, although both sell some similar goods, those goods do not appear side-by-side on a shelf in direct competition); *Autozone*, 373 F.3d at 798 (finding products of two companies not sufficiently related to tilt factor in favor of the plaintiff because, despite small overlap between the products offered by the parties, generally there is no overlap and therefore the parties only compete directly in a very limited fashion).

In the present case, one could argue that Powerhouse's products and services are closely related to Impex's products because they offer fundamentally the same thing: a healthy, fit body.  *See Wynn I*, *supra*.  The Court finds, however, that the parties' products and services are only somewhat related.  Most significantly the Court does not believe that Powerhouse and Impex compete directly.  Powerhouse sells a variety of products related to fitness and nutrition, but it does not sell fitness equipment.  Impex, in comparison, only sells fitness equipment.  Powerhouse sells its products and services only at its gyms; whereas Impex's products are sold only at large retail stores.  Thus the parties' products and services do not overlap at all.

    **D.**     **Similarity of the Marks**

Defendants concede that Impex and Powerhouse use the mark "Powerhouse" alone and in connection with other words and that this factor "favors a finding of likelihood of confusion."  *See* Defs.' Resp. at 14.

### E.    Evidence of Actual Confusion

In *Wynn I*, the Sixth Circuit recognized that evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion.  839 F.2d at 1188.  Therefore, where there is evidence of past confusion, this factor is weighed heavily.  *Id*. (quoting *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 914 (Fed. Cir. 1984)).  The lack of evidence of actual confusion, however, is not afforded equal significance. As the Sixth Circuit has stated, "it does not follow that lack of evidence of actual confusion should be a significant factor."  *Id*.  There is an exception though "when the particular circumstances indicate such evidence should have been available."  *Id*.  Although the *Wynn I* court did not provide specific examples of circumstances where the absence of confusion may be significant, the Sixth Circuit subsequently suggested that a lack of complaints about actual confusion may be meaningful where the complained-of use occurred over a long period of time.  *See Data Concepts*, 150 F.3d at 626;  *see also Daddy's*, 109 F.3d at 284 (stating that "isolated instances of actual confusion after a significant period of time of concurrent sales or extensive advertising do not always indicate an increased likelihood of confusion and may even suggest the opposite.")

To establish actual confusion, Powerhouse relies on Impex's statements in the document titled "Company Biography and Brand Names."  *See* Pl.'s Mot. Ex. 4.

21

Powerhouse contends that Impex's statement that its use of an "almost . . . identical trademark . . . helps brand exposure" reflects Impex's acknowledgment of actual confusion.  Powerhouse also relies on the findings from Berger's survey that consumers are confused as to the origin and/or sponsorship of Impex's products.

In light of the weight this Court has accorded Berger's survey, the Court does not find that it provides evidence of actual confusion.  As to Impex's statement that its use of the "Powerhouse" mark "helps brand exposure," the Court finds a genuine issue of material fact as to whether such evidence demonstrates actual confusion. On the one hand, as defendants argue, this statement simply may represent "a speculative statement made by Impex in marketing its goods."  *See* Defs.' Resp. at 15.  On the other hand, the statement may represent Impex's finding that labeling its equipment "Powerhouse" in fact "helps brand exposure" by actually causing confusion in the marketplace.

Additionally, the Court believes that this case presents circumstances where the absence of actual confusion may be significant.  As defendants point out, Impex first began selling "Powerhouse" fitness equipment in May 1996.  Since then, Impex's "Powerhouse" equipment has been advertised, displayed, and sold nationwide through large retailers.  Nevertheless, in its pleadings regarding invalidity, Powerhouse has not presented one instance of a consumer confusing Impex's products with Powerhouse– for example, there are no instances of consumers inquiring as to the affiliation of Impex or its products with Powerhouse; no complaints or accolades sent to Powerhouse concerning Impex's products; no returns of Impex's products to Powerhouse; and no payments or

22

invoices sent to Powerhouse which should have been sent to Impex.

Based on the absence of such evidence and the different interpretations the trier of fact could assign to Impex's statements in its "Company Biography and Brand Names" document, the Court finds a genuine issue of material fact with respect to this factor.

### F.    Marketing Channels Used

This factor "looks to 'how and to whom the respective goods or services of the parties are sold.'" *Sports Auth.*, 965 F. Supp. at 939-40 (quoting *Champions Golf Club*, 78 F.3d at 1120). Powerhouse argues that this factor favors a finding of likelihood of confusion because both it and defendants use newspapers, magazines, mailers, trade shows, and the Internet to market their goods and/or services. Defendants contend that the parties in fact do not use the same marketing tools for the same customers. Instead, defendants argue, Impex markets its products to retailers at trade shows and on the Internet; Impex's customers (i.e. retailers) in turn market Impex's products to consumers in newspaper advertisements, including mailers and inserts. *See* Pl.'s Mot. Ex. 9. Powerhouse, in comparison, promotes its services and goods to prospective franchisees and prospective health club members in trade and health-related magazines and on the Internet. *See id.* Ex. 8.

The fact that the parties provide information about their goods and services on the Internet does not automatically lead this Court to conclude that they use common marketing channels. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 637 (6th Cir. 2002)(citing *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002)). As

23

the Sixth Circuit explained, "a non-specific reference to Internet use is no more proof of a

company's marketing channels than the fact that it is listed in the Yellow Pages of the

telephone directory." *Id*. Instead, to determine whether the parties' use of the Internet

constitutes similar marketing channels, the Sixth Circuit directed courts to consider the

following questions: "(1) 'whether both parties use the Web as a *substantial* marketing

and advertising channel,' (2) 'whether the parties' marks are utilized in conjunction with

Web-based products,' and (3) 'whether the parties' marketing channels overlap in any

other way.'" *Id*. (quoting *Entrepreneur Media*, 279 F.3d at 1151).  The Court is not able

to answer these questions based on the evidence presented by the parties.  The Court

therefore finds that the parties do not use the same marketing channels for the same

customers.

### G.    Likely Degree of Purchaser Care

Defendants argue that "both the services of [Powerhouse] and the products of

Impex are relatively expensive" and therefore consumers will use a high degree of care

when making purchases.  *See* Defs.' Resp. at 16.   Generally, the more care that a

purchaser is likely to take in comparing products, the less likely the chance of confusion.

*Homeowners*, 931 F.2d at 1111.  Defendants concede, however, that Impex's and

Powerhouse's marks are similar (in fact Impex concedes that they are "almost . . .

identical").  "If marks are similar . . . 'then purchaser care will decrease the likelihood of

confusion only minimally.'"  *PACCAR, Inc. v. TeleScan Tech. LLC*, 319 F.3d 243, 254

(6th Cir. 2003)(quoting *Daddy's*, 109 F.3d at 286).  In other words, "confusingly similar

24

marks may lead a purchaser who is extremely careful and knowledgeable about the [product] that he is buying to assume nonetheless that the seller is affiliated with or identical to the other party." *Id*. The Court therefore concludes that this factor, despite a high degree of care, does not favor defendants.

### H.    Intent of Junior User in Selecting Mark

If a junior user selects a mark with the intent of deriving benefit from the reputation of the senior user, "that fact alone 'may be sufficient to justify the inference that there is a confusing similarity.'" *Wynn I*, 839 F.2d at 1188-89 (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980)); *see also Autozone*, 373 F.3d at 799. As the Sixth Circuit has stated, the "[i]ntent of [the] defendant in adopting [its mark] is a critical factor, since if the mark was adopted with the intent of deriving benefit from the reputation of [the plaintiff], that fact alone may be sufficient to justify the inference that there is confusing similarity." *Frisch's*, 670 F.2d at 648.

Powerhouse argues that Impex intentionally selected "Powerhouse" as its mark in order to create customer confusion and/or benefit from Powerhouse's goodwill. To support its argument, Powerhouse points out that Impex admits that it was aware of Powerhouse and Powerhouse's marks when it began using the Powerhouse mark for its fitness equipment. *See* Mot. Ex. 1 at 1; Ex. 2 at 10-12. Evidence indicating that the junior user was aware of the senior user's prior use of a mark supports "an inference of intentional infringement." *Wynn II*, 943 F.2d at 603 (citations omitted). Powerhouse claims that other evidence further supports this inference.

25

First, Powerhouse relies on the "Company Biography and Brand Names" document in which Impex states that its use of an "almost . . . identical mark . . . helps brand exposure." *See* Mot. Ex. 4. Second, Powerhouse argues that it is Impex's common business practice to adopt the marks of "famous health clubs to help sell its exercise equipment." *See* Mot. at 15. To demonstrate that this is Impex's usual practice, Powerhouse presents evidence to show that Impex began using the name "Curves at home" on some of its exercise equipment in April 2003, mimicking the mark used for Curves gyms. *See id.* Ex. 3. Powerhouse contends that Impex has not limited this practice to health clubs, but also copied the mark of a popular fitness magazine called "Hers." *See* Reply Ex. 13. Finally, Powerhouse points out that Impex has obtained licenses from other entities, including health clubs, to use their marks on its exercise equipment.

Impex responds that it selected the "Powerhouse" mark because the name connotes "strength," not because of Powerhouse's gyms and products. *See* Defs.' Resp. Chung Decl. ¶ 3; Lawson Decl. ¶ 4. According to Impex, before settling on "Powerhouse" as its mark, it conducted a search of the PTO's records and determined that the mark– although registered for gyms, athletic equipment, and nutritional bars– was not registered for fitness equipment. *See id.* Chung Decl. ¶ 4. Impex claims that after internal discussions, it concluded that its use of the mark for fitness equipment sold in retail outlets would not cause consumer confusion with Powerhouse's services and products which were only provided or sold at Powerhouse gyms. *See id.* ¶ 4; Lawson Decl. ¶ 5.

Impex further responds that it subsequently applied for and received registration from the PTO for its use of the Powerhouse mark with its fitness equipment, despite Powerhouse's use of the mark.  Although Impex cites case law from other jurisdictions holding that federal trademark registration is *prima facie* evidence of good faith use of a mark and "negate[s] any finding of willful infringement,"  *see* Defs.' Resp. at 16, the Sixth Circuit has specifically rejected registration as evidence of good faith.  *See Mktg. Displays, Inc. v Traffix Devices, Inc.*, 200 F.3d 929, 936 (6th Cir. 1999), *rev'd on other grounds*, 523 U.S. 23, 121 S. Ct. 1255 (2001).

As to Impex's use of the "Curves" and "Hers" marks, Impex argues that there is no evidence that it adopted those marks in bad faith and that therefore such usage does not establish that Impex, as a routine, intentionally infringes the marks of others.  To demonstrate that it in fact acted in good faith in adopting the "Curves" mark, Impex explains that it developed exercise equipment mirroring the Curves gym's fitness programs which it hoped to market jointly with Curves International.  *See* Defs.' Resp. Ulves Decl. ¶ 2. After registering the mark "Curves at home" with the PTO for its equipment, Impex presented its idea to Curves International.  *See id.* ¶ 3.  When Curves International rejected Impex's proposal and declined to license the "Curves" mark to Impex, Impex withdrew the trademark application and dropped its program for "Curves at home" exercise equipment.  *See id.*  As to Impex's use of the "Hers" mark, Impex argues that the prior use and registration for "Hers" was for a publication and therefore Impex reasonably believed that its use of "Hers" for fitness equipment would not be a

27

confusingly similar use.

As there is conflicting evidence with respect to Impex's reason for selecting the "Powerhouse" mark, the Court finds a genuine issue of material fact as to whether this factor favors a finding of likelihood of confusion.

### I.      Likelihood of Expansion of Product Lines

"[A] 'strong possibility' that either party may expand [its] business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Homeowners*, 931 F.2d at 1112 (citation omitted); *see also Wynn II*, 943 F.2d at 604. Geographic expansion or increase in the types of products or services offered can be relevant. *See id*. "A finding that the parties will not expand their markets significantly, however, 'does not address' the ultimate issue of likelihood of confusion." *Daddy's*, 109 F.3d at 287 (quoting *Champions Golf Club*, 78 F.3d at 1133).

Powerhouse contends that the parties already compete directly because Powerhouse uses its marks on fitness equipment, including dumbbells and barbells. As Impex points out, however, Powerhouse does not sell its fitness equipment and has not done so in the more than thirty years it has been in business. *See* Defs.' Resp. at 18.[8] Impex states that it has no intention of expanding its business into bodybuilding services

_____

[8]While defendants do not cite any authority for this statement, Powerhouse does not refute it. In subsequent pleadings, however, there is evidence that Powerhouse may have sold fitness equipment at one time but that it has not done so since 1998. *See* Defs.' Mot. for Summ. Adjudication that Pl. is not Entitled to the Monetary Recovery it Seeks, filed 10/3/05 at 2.

or gyms.  The Court therefore finds that there is no likelihood of expansion to render this factor relevant to its likelihood of confusion analysis.

### J.    Conclusion

With respect to Powerhouse's motion for summary judgment on infringement, the Court finds a genuine issue of material fact with respect to some of the factors necessary to determine likelihood of confusion, most significantly the strength of Powerhouse's mark and Impex's intent in adopting "Powerhouse" as its mark.  As the Court also finds no evidence of actual confusion, it concludes that Powerhouse's motion should be denied.

## III.    Laches and Estoppel

In their Answer to Powerhouse's Complaint and Amended Complaint, defendants assert the affirmative defenses of laches and estoppel.  Defendants have filed a motion for summary judgment with respect to these defenses, although they subsequently withdrew their motion as to estoppel.  *See* Defs.' Resp. to Pl.'s cross-mot. at 1.  Powerhouse, however, has filed a cross-motion for summary judgment with respect to both defenses.

### A.    Laches

"Laches is the 'negligent and unintentional failure to protect one's rights.'" *Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298, 320 (6th Cir. 2001)(quoting *Elvis Presley Enterprises, Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991)).  As one court has stated, the doctrine is derived from the maxim that "those who sleep on their rights lose them."  *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999).  In this Circuit, laches only bars damages that occurred before

29

the filing date of the lawsuit; it does not foreclose a plaintiff's right to an injunction and post-filing damages. *Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 412 (6th Cir. 2002)(citing *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 568 (6th Cir. 2000)); *see also TWM Mfg. Co. v. Dura Corp.*, 592 F.2d 346, 349-50 (6th Cir. 1979).

A party asserting laches must show: "(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *Herman Miller*, 270 F.3d at 320-21 (citing *Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 367 (6th Cir. 1985)). In the Sixth Circuit, there is a strong presumption that a plaintiff's delay is not unreasonable provided the applicable state statute of limitations has not lapsed. *Id*. Conversely, it is "'presume[d]' that an action is barred if not brought within the period of the statute of limitations . . ." *Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 365 (6th Cir. 1985)(citations omitted).

The Lanham Act does not contain a statute of limitations. Courts therefore look to the analogous state statute of limitations to determine whether a party has been diligent in protecting its trademark. For trademark cases in Michigan, the applicable statute of limitations is the three year period for injury to personal property. *Herman Miller*, 270 F.3d at 321 (citation omitted). "[A] delay beyond the three-year statutory period is presumptively prejudicial and unreasonable." *Nartron Corp.*, 305 F.3d at 408. This period is measured from the time at which the plaintiff had "actual or constructive knowledge of the alleged infringing activity." *Id*.; *see also Kellogg Co.*, 209 F.3d at 569-70 (citations omitted).

30

Impex claims that Powerhouse had actual knowledge of Impex's use of the Powerhouse mark on its fitness equipment as a result of discussions between Impex's representatives and Brian Kukon at the February 1997 SGMA Super Show. Impex further asserts that Powerhouse at least had constructive knowledge of its use of the Powerhouse mark beginning in February 1997, when Impex's customers began advertising Impex's "Powerhouse" equipment in nationwide newspapers, including major newspapers in the Detroit metropolitan area where Powerhouse is incorporated and maintains its principal place of business.

Powerhouse claims that it only became aware of Impex's infringing activity in late November or early December 2001, when Gary Vetar called to congratulate Powerhouse on its use of the mark on fitness equipment. *See* Pls.' cross-mot. Ex. 20. According to Powerhouse, it did not discover Impex's use as a result of discussions between Impex's representatives and Kukon at the 1997 SGMA Super Show because Kukon was not an agent or employee of Powerhouse. *See id*. Ex. 18 ¶ 7. Powerhouse maintains that Kukon was the President of Americus Design Group, Ltd. ("Americus"), a company which had entered into a licensing agreement with Powerhouse for select Powerhouse marks. *See id*. ¶ 4. Powerhouse presents evidence to show that Americus did not have authority to negotiate or enter into contracts on behalf of Powerhouse or represent Powerhouse's interests. *See id*. ¶ 8. Apparently Powerhouse terminated its licensing agreement with Americus approximately one week after the 1997 SGMA Super Show. *See id*. ¶ 15.

Defendants fail to present evidence to rebut Powerhouse's assertion that Kukon

31

was not a Powerhouse employee or agent.[9]  Thus the Court cannot conclude that

Powerhouse had actual knowledge of Impex's use of the "Powerhouse" mark as a result

of any discussions between Kukon and Impex's representatives at the 1997 SGMA Super

Show.  The Court however does find that Powerhouse had constructive knowledge of

Impex's use of the Powerhouse mark as early as 1997, or at least in 1999, due to the

extensive nationwide advertising of Impex's equipment by Impex's customers during that

period.  *See Herman Miller*, 250 F.3d at 321-22 (finding that the defendant's advertising

of its product in a major newspaper put the plaintiff on constructive notice of the

defendant's infringing activity).   In 1999, 2000, and 2001, Dunham's advertised Impex's

products fifty-three times in the Detroit News, alone.  *See* Lemere Decl. ¶ 3.  As

Defendants demonstrate, this represents only a small fraction of the advertising of

Impex's products conducted by retailers during this period.  *See id.* & Corbett Decl.

The Court therefore concludes that Powerhouse knew that Impex was using the

"Powerhouse" mark for at least five years before this suit was filed.  As this delay

exceeds the applicable statute of limitations by two years, there is a presumption of

laches.  In order to overcome this presumption, Powerhouse must:

(1) rebut the presumption of prejudice; (2) establish that there

_____

[9]In its response to Powerhouse's cross-motion for summary judgment, defendants
contend that there are "conflicting assertions concerning the nature and extent of the
authority of persons at the Powerhouse booth at the SGMA Super Show in 1997."  The
Court, however, does not see any evidence suggesting that Kukon had authority to
represent Powerhouse and therefore does not find any genuine issue as to Kukon's
relationship with Powerhouse.

> was a good excuse for its delay; or (3) show that [Impex]
> engaged in "particularly egregious conduct which would
> change the equities significantly in [Powerhouse's] favor."

*Nartron Corp.*, 305 F.3d at 409 (quoting *Dana Corp. v. IPC Ltd. P'ship*, 674 F. Supp.

581, 583 (E.D. Mich. 1987)).

Powerhouse argues that Impex intentionally adopted the "Powerhouse" mark in

order to trade-off Powerhouse's reputation and goodwill and that this overcomes the

presumption of laches.  "It is well established that 'laches is not a defense . . . when the

defendant intended the infringement.'"  *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*,

219 F.3d 104, 107 (2d Cir. 2000)(quoting *Harlequin Enters. Ltd. v. Gulf & W. Corp.*, 644

F.2d 946, 950 (2d. Cir. 1981))  "'[H]e who comes into equity must come with clean

hands.'"  *Id.* (quoting *Precision Instr. Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806,

814, 65 S. Ct. 933 (1945)); *see also Induct-O-Matic Corp.*, 747 F.2d at 367 (noting that

"[l]aches is an equitable defense and . . . can certainly be raised only by one who comes

into equity with clean hands.")  As set forth above with respect to infringement, the Court

finds a genuine issue of material fact as to whether Impex deliberately selected the

"Powerhouse" mark  intending to benefit from Powerhouse's goodwill and reputation.

The Court therefore finds a genuine issue of material fact as to whether Impex may assert

laches to bar Powerhouse's request for pre-suit damages.

There is no evidence, however, that the retail defendants intentionally sold

infringing products.  Defendants therefore contend that these defendants may invoke

laches to bar Powerhouse's request for pre-suit damages, even if Impex ultimately cannot

benefit from the defense.  Powerhouse responds that laches is a personal defense and therefore any alleged delay by Powerhouse with respect to Impex is irrelevant to the retailer-defendants.  *See* Pl.'s cross-mot. at 15-16 (citing *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.*, 743 F.2d 1039, 1046 (4th Cir. 1984)).  Powerhouse argues that the retailer-defendants must come forward with evidence establishing Powerhouse's delay in bringing suit against them and prejudice resulting from any delay.  *See id*. at 16.

Defendants present evidence to show that Dunham's and Dick's began advertising Impex's products at least as early as 1997, and at the latest in 1999.  Powerhouse delayed filing suit against these retailers for at least five years.  Laches therefore is presumed as to these defendants.  Powerhouse fails to present evidence to overcome this presumption.

Defendants present no evidence as to when Costco, Meijer, and Wal-Mart began advertising Impex's "Powerhouse" fitness equipment.  Relying on *Odetics, Inc. v. Storage Technology Corporation*, 919 F. Supp. 911 (E.D. Va. 1996), defendants argue that the absence of such evidence is not relevant as these defendants are entitled to the benefits of Impex's laches defense because Impex is indemnifying its customers in this action.[10]  *See* Defs.' Resp. to Pl.'s cross-mot. at 6.  However, because the Court has

---

[10]Defendants argue that they are entitled to the benefit of Impex's laches defense, regardless of whether Impex is barred from asserting this defense due to bad faith. Defendants further argue that any delay by Powerhouse in asserting its rights against Impex should be counted towards Powerhouse's delay as to the retailer-defendants.  Thus defendants contend that they do not need to put forth evidence to show when Meijer, Costco, and Wal-Mart began advertising Impex's products or to establish any prejudice resulting from Powerhouse's delay.

determined that there is a question of fact as to whether Impex is entitled to the defense of laches, the Court is not prepared to decide whether Costco, Meijer, and Wal-Mart are entitled to the defense.  In other words, the Court concludes that the issue of whether laches bars Powerhouse's request for pre-suit damages from Costco, Meijer, and Wal-Mart– absent evidence demonstrating when Powerhouse should have known that these retailers sold alleged infringing fitness equipment– is dependent upon a finding as to whether Impex is barred from asserting laches due to unclean hands.

As the Court has found a genuine issue of material fact with respect to that issue, the Court concludes that neither Powerhouse, Impex, Costco, Meijer, nor Wal-Mart are entitled to summary judgment with respect to defendants' laches defense.  Dunham's and Dick's, however, are entitled to summary judgment based on laches.

### B.    Estoppel

As with laches, estoppel requires the party asserting it to show unreasonable delay and prejudice resulting from the delay; but estoppel requires more.  *Kellogg Co.*, 209 F.3d at 569 (citing *Elvisly Yours*, 936 F.2d at 894).  Estoppel requires a showing by the party asserting it that "'it had been misled by plaintiff through actual misrepresentations, affirmative acts of misconduct, intentional misleading silence, or conduct amounting to virtual abandonment of the trademark.'"  *Nartron Corp.*, 305 F.3d at 412-13 (quoting *SCI Sys., Inc. v. Solidstate Controls, Inc.*, 748 F. Supp. 1257, 1261-61 (S.D. Ohio 1990)).  By proving the elements of estoppel, a defendant can defeat a plaintiff's request for post-filing damages and injunctive relief.  *Id.*; *see also Tandy Corp.*, 769 F.2d at 366 n.2;

35

*Kellogg Corp.*, 209 F.3d at 568.

Defendants assert that they are entitled to an estoppel defense because Powerhouse remained silent in response to widespread and extensive use of its mark by defendants and Impex's statements to Kukon at the 1997 SGMA Super Show. The Sixth Circuit has held, however, that "[f]or silence to work an estoppel, some evidence must exist to justify an inference that the silence was sufficiently misleading to amount to 'bad faith.'" *TWM Mfg. Co.*, 592 F.2d 346, 350 (6th Cir. 1979). While mere delay in filing suit generally is not sufficient to demonstrate bad faith, the Sixth Circuit has recognized that "'there is that narrow class of cases where the plaintiff's delay has been so outrageous, unreasonable and inexcusable as to constitute virtual abandonment of its right.'" *Kellogg Co.*, 209 F.3d at 569 (quoting *Univ. of Pittsburgh v. Champion Prod., Inc.*, 686 F.2d 1040, 1044-45 (3d Cir. 1982)).

The length of delay that puts a case into this narrow class can be gleaned from the case the Third Circuit relied upon in *University of Pittsburgh v. Champion Products, Inc.: Anheuser-Busch, Inc. v. DuBois Brewing Co.*, 175 F.2d 370 (3d Cir. 1949). In *Anheuser-Busch*, the court noted that a lapse of a hundred years or more would warrant estoppel. Also instructive is the district court's decision in *Kellogg*, where the court found that the plaintiff was grossly-remiss in failing to assert its rights over a thirty-two year period and therefore that its suit should be barred. *Kellogg Co. v. Exxon Corp.*, No. 96-3070, 1998 WL 1051061 (W.D. Tenn. August 31, 1998)(unpublished op.), *rev'd*, 203 F.3d 562 (6th Cir. 2000). This holding was reversed on appeal, but only because the Sixth Circuit

36

determined that the delay was far shorter due to progressive encroachment. *See Kellogg Co.*, 209 F.3d at 573.

The Court therefore does not find that Powerhouse's delay of five to seven years puts this case in that narrow class of cases where the plaintiff's delay constitutes a virtual abandonment of its rights. Additionally, defendants fail to present evidence suggesting that Powerhouse's silence during that period was the result of bad faith.[11] Finally, Powerhouse presents unrefuted evidence to show that Kukon was neither its agent nor its employee and therefore any statements made by Kukon to Impex's representatives and any information Impex's representatives provided to Kukon cannot be imputed to Powerhouse. Accordingly, the Court concludes that Kukon's silence or statements at the 1997 SMGA Super Show do not amount to an express or implied assurance from Powerhouse that it would not assert its trademark rights against Impex.

Accordingly, the Court concludes that Powerhouse is entitled to summary judgment with respect to Defendants' estoppel defense.

## IV.   Statute of Limitations

Defendants contend that Michigan's three-year limitations period for injury to personal property is the statute of limitations applied in trademark infringement cases. Defendants therefore argue that they are entitled to summary judgment with respect to the

---

[11]The Court also notes that during this period Powerhouse was not completely silent, as it moved to have Impex's registration of the "Powerhouse" mark revoked in April 2002.

37

issue of whether Powerhouse can recover damages based on any act of infringement three years before a defendant was named as a party in this action. Powerhouse responds that there is no statute of limitations defense to a Lanham Act claim; but rather, principles of laches determine when a plaintiff's suit should be barred under the act.

Defendants cite a number of cases where courts applied state statutes of limitations to find the plaintiff's Lanham Act claims time barred. *See* Defs.' Mot. on damages at 4-5. The Sixth Circuit, however, specifically rejected this approach in *Ford Motor Co. v. Catalanotte*, 342 F.3d 543 (6th Cir. 2003). Pursuant to *Catalanotte*, laches, rather than a state statute of limitations determines when a plaintiff's Lanham Act claims should be barred. *Id*. at 550.

In *Catalanotte*, Ford Motor Company ("Ford") brought an action against the registrant of the internet domain name "FORDWORLD.COM," alleging cyberpiracy, trademark dilution, trademark infringement, and false designation of origin in violation of the Anticybersquatting Consumer Protection Act ("ACPA"). *Id*. at 545. In 1999, Congress passed the ACPA as an amendment to the Lanham Act. *See id*. at 546. The defendant Catalanotte sought dismissal of Ford's claim, arguing that it was barred by the applicable statute of limitations– that being Michigan's three-year limitations period for injury to property. *Id*. at 549. Ford argued that the equitable doctrine of laches governs Lanham Act claims, not Michigan's limitations period. *Id*. at 549-50. The Sixth Circuit agreed with Ford.

The court held:

> Catalanotte's argument is an attempt to apply a statute of
> limitations that is inapplicable to Lanham Act claims.
> Although the Supreme Court has adopted analogous state
> statutes of limitations in the context of certain federal actions
> ... courts have not treated Lanham Act cases in the same
> manner.  Instead, the "Lanham Act does not contain a statute
> of limitations.  In determining when a plaintiff's suit should
> be barred under the Act, courts have consistently used
> principles of laches as developed by courts of equity."

*Id*. at 550 (quoting *Tandy Corp.*, 769 F.2d at 365).  This holding is consistent with the

language of the Lanham Act, which provides that injunctive relief and monetary damages

should be granted "according to" or "subject to" "the principles of equity."  15 U.S.C. §§

1116 & 1117.

Pursuant to *Catalanotte*, this Court concludes that defendants' motions for

summary judgment regarding limitation of damages based on the applicable statute of

limitations must be denied.

**V.      Conclusions**

For the reasons set forth above, the Court finds a genuine issue of material fact

relevant to Powerhouse's motion for summary judgment of infringement, Impex's,

Costco's, Meijer's, and Wal-Mart's motions for summary judgment with respect to

laches, and Powerhouse's cross-motion for summary judgment as to laches.  The Court

concludes that there is no genuine issue of material fact as to Powerhouse's cross-motion

for summary judgment as to defendants' estoppel defense and as to Dunham's and Dick's

motion for summary judgment as to laches.  Finally the Court holds that defendants are

not entitled to summary judgment with respect to their claim that Powerhouse's damages

should be limited based on Michigan's three-year statute of limitations.

An Order consistent with this Opinion shall issue


                                    s/PATRICK J. DUGGAN
                                    UNITED STATES DISTRICT JUDGE

Copies to:
George T. Schoof, Esq.
Edward R. Schwartz, Esq.
Kathleen Lang, Esq.
Howard W. Burdett Jr., Esq.